IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY HAIAR, | ) |
| | ) |
| Plaintiff, | ) Case No. 05 C 0295 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Martin C. Ashman |
| **MICHAEL J. ASTRUE**, Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mary Haiar, seeks reversal of the final decision of Defendant, Michael J. Astrue

("Commissioner"), the Commissioner of the Social Security Administration ("SSA"), who denied

Haiar's Disability Insurance Benefits ("DIB") application. The Commissioner moves for

summary judgment, asking the Court to affirm his decision. Both parties have consented to have

this Court conduct any and all proceedings in this case, including the entry of final judgment.

*See* 28 U.S.C. § 636(c); Local R. 73.1. For the reasons set forth below, the Commissioner's

decision is reversed and remanded.

## I. Background

### A. Procedural History

Haiar protectively filed an application for DIB on February 22, 2000. (R. at 13.) Haiar

argues that she became disabled on November 10, 1999, due to diabetes mellitus, hypertension,

morbid obesity, depression, and eyesight loss in her right eye.[1] (R. at 13, 103-05, 118.) The SSA denied Haiar's claim via letter dated June 9, 2000, and she timely filed a request for reconsideration received June 29, 2000. (R. at 70-74.) On August 31, 2000, the SSA affirmed its denial of Haiar's claim. (R. at 76-78.) Haiar requested a hearing before an administrative law judge, and a hearing was held on May 16, 2001 before Administrative Law Judge John K. Kraybill ("ALJ"). (R. at 13, 79-80.) After the ALJ denied Haiar's claim for DIB on June 11, 2001, Haiar requested that the Appeals Council review the ALJ's decision. (R. at 6.) On January 24, 2002, the SSA denied Haiar's request, making the ALJ's decision the final decision of the Commissioner. (R. at 4-5.) Having exhausted all of her administrative remedies, Haiar requests judicial review of the ALJ's decision by this Court pursuant to 42 U.S.C. § 405(g).

### B. Plaintiff's Education and Work History

Mary Haiar was born on ⸏ ⸏ ⸏ ⸏ ⸏, and was sixty years old on the date of her hearing. (R. at 103.) She is an Illinois resident who has completed her education through the twelfth grade. (R. at 30, 124.) She worked as a mail machine operator and check writer at Metropolitan Life Insurance from 1981 through November 1999, at which time her job was moved to New York and Metropolitan Life Insurance put her on retirement. (R. at 30, 111-16, 118-19.) Her job required her to write checks, enter data into a computer, update incorrect address information, and carry a mail tray. (R. at 32, 119.)

---

[1] Haiar's alleged onset date was later amended to January 1, 2000. (R. at 13.)

## C. Medical Evidence

Haiar has suffered from multiple medical problems that require constant monitoring. (R. at 222.) Her diagnoses include hypertension, diabetes mellitus, morbid obesity, likely hypertensive heart disease, cardiomegaly, and depression. (*Id.*) She has also lost nearly all vision in her right eye due to a right central retinal artery occlusion. (*Id.*) Before her alleged disability onset of January 1, 2000, Haiar had received treatment for hypertension, diabetes, and depression, and as early as September 1998 she was prescribed Procardia XL, Lasix, Micro-K, and Zoloft. (R. at 189-90.) On October 31, 1999, Haiar received urgent treatment from Dr. Bharti Patel when her blood pressure reached 178/120 and had to be normalized using Clonidine and other medications. (R. at 184-85.) Tests also revealed that her glucose level was high. (R. at 217.) On November 13, 1999, lab tests showed high glucose and cholesterol levels, prompting Dr. James W. Roh to prescribe Glyburide for diabetes and Lipitor for high cholesterol. (R. at 180, 215.)

Haiar visited ophthalmologist Dr. Tosca M. Kekish on January 4, 2000, after she awoke on January 1 with no vision in her right eye. (R. at 201.) Dr. Kekish diagnosed Haiar with central retinal artery occlusion. (*Id.*) Dr. Kekish told Haiar that he could provide no treatment at that time, but recommended that Haiar follow up with Dr. Roh to investigate a possible vascular cause of the occlusion. (*Id.*) Dr. Roh referred Haiar for an echocardiogram in order "to rule out a cardiac source of thromboembolism," and for a carotid Doppler study; Dr. Roh later reported that both tests were normal. (R. at 178, 179, 208-11.)

After Haiar visited Dr. Roh on February 21, 2000, complaining of redness in her right eye, pain near her right eye, and pain in the back of her head, he ordered a metabolic panel, a

- 3 -

lipid panel, and a CT scan. (R. at 177.) On February 24, 2000, Dr. Roh reported that Haiar's glucose was controlled at 139 and her total cholesterol was at 207. (R. at 176.) Shortly thereafter, on March 3, 2000, Haiar underwent a CT scan of her brain, which on March 10 Dr. Roh reported was negative. (R. at 175, 207.)

More complaints of redness, pain, and watering in her right eye brought Haiar back to Dr. Kekish on March 13, 2000. (R. at 198.) Dr. Kekish examined Haiar's right eye and found that the pupil was dilated, the cornea was steamy, the iris showed mild to moderate rubeosis, the lens showed a nuclear sclerosis, and the intraocular pressure was sixty-eight. (R. at 198.) The intraocular pressure in her left eye was twenty. (Id.) Also, although Haiar denied light perception in her right eye, her left eye had 20/20 vision. (Id.) Dr. Kekish diagnosed Haiar with neovascular glaucoma in the right eye, secondary to a central retinal artery occlusion. (R. at 198.)

Haiar underwent pan retinal photocoagulation ("PRP") treatment with Dr. Kekish for her right eye on March 14 and March 21 of 2000. (R. at 194, 196.) On March 14, 2000, Haiar experienced discomfort and Dr. Kekish was "unable to do as much laser as [he] wanted." (R. at 196.) On March 21, 2000, Dr. Kekish continued PRP treatment, which Haiar tolerated well. (R. at 194.) Although the pain had decreased, Haiar still complained of pain in her right eye at her follow-up appointment on April 5, 2000. (R. at 192.) Dr. Kekish referred Haiar to Dr. John Pollock, a retinal specialist. (R. at 192.)

On April 14, 2000, Haiar was admitted to Central DuPage Hospital where Dr. Ruth Williams performed transcleral contact diode laser cyclophotocoagulation, a same-day procedure. (R. at 151-163.) Haiar experienced no complications and tolerated the procedure very well.

- 4 -

(R. at 153.) In an ophthamological report dated May 4, 2000, Dr. Pollock noted Haiar's diagnosis of central retinal artery occlusion and neovascular glaucoma, and indicated that Haiar's visual function would not be further impaired by prolonged or occasional reading, stretching, or lifting. (R. at 148-49.) He further stated that Haiar's function or employability would not be markedly improved by treatment or appliance. (R. at 149.)

On May 10, 2000, Haiar again visited Dr. Roh with complaints of right eye pain, which he attributed to her neovascular glaucoma. (R. at 174.) Lab tests indicated that her glucose level was 147 and that her total cholesterol level was 196, which Dr. Roh characterized as "actually fairly good." (Id.)

On June 5, 2000, an Illinois Department of Disability Determination Services ("DDS") physician reviewed Haiar's medical file and concluded that Haiar could complete unlimited pushing or pulling, and that Haiar could lift or carry ten pounds for two-thirds of the day and twenty pounds occasionally. (R. at 165.) The physician found that during an eight-hour workday Haiar could stand or walk for two hours and sit for about six hours. (Id.) The physician also found that Haiar could perform occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps or stairs. (R. at 166.) He noted that Haiar should avoid concentrated exposure to extreme heat and hazards such as machinery and heights, and should never climb ladders, ropes, or scaffolds. (R. at 166-68.) Depth perception was deemed Haiar's only visual limitation. (R. at 167.) On August 23, 2000, Dr. Reynaldo Gotanco affirmed the assessment. (R. at 164.)

Haiar's continued multiple chronic medical problems were documented by Dr. Roh during three subsequent visits on July 19, 2000, September 28, 2000, and February 21, 2001.

- 5 -

(R. at 172, 226, 229.) Dr. Roh also noted Haiar's history of transient ischemic attacks[2] ("TIAs") as well as probable mild peripheral vascular disease. (R. at 172, 226, 229.) Follow-up visits to Dr. Kekish on November 13, 2000, March 7, 2001, and March 19, 2001, revealed that Haiar continued to be essentially blind in the right eye but had 20/25 vision in the left eye. (R. at 224-25, 228.) Although Haiar reported pain in her right eye on March 7, she was comfortable by March 19. (R. at 224-25.)

### D.    ALJ Hearing Testimony

#### 1.    Haiar's Testimony

At the ALJ hearing on May 16, 2001, Haiar testified that the vision loss in her right eye in January of 2000 was sudden and has been a partial cause of her depression.[3] (R. at 31, 41.) Due to pressure on her eye, she also suffers headaches three or four times per week that last several hours. (R. at 37.) In her left eye, Haiar has good distance vision but poor close vision. (R. at 44.)

Haiar's blood sugar is monitored through monthly testing at her doctor's office, and she self-monitors her blood pressure. (R. at 32, 35-36.) Due to her diabetes she is very thirsty and drinks a lot of water. (R. at 38.) She also testified that her fingers, feet, and ankles swell,

---

[2] A transient ischemic attack is "a brain disorder caused by a temporary interruption of blood supply to the brain. . . . A TIA results in a temporary loss in brain functions that may last from several minutes to several hours. A TIA that lasts for more than 24 hours is a stroke." Am. Med. Ass'n, Complete Medical Encyclopedia 1232 (2003).

[3] Haiar also testified that the recent death of her father has contributed to her depression. She has taken Zoloft at various times for her "nerves." (R. at 31, 41.)

particularly in hot, humid weather. (R. at 38-39.) Aside from dry mouth, she suffers no side effects from her medications. (R. at 35.)

Haiar testified that she has difficulty walking and was told by Dr. Roh that she should not walk more than two blocks at a time. (R. at 39.) To prevent her from having a heart attack, Dr. Roh helped her obtain a handicap parking permit. (R. at 42.) Haiar also has difficulty standing and sitting in certain positions for more than thirty minutes. (R. at 36, 39-40.) When sitting at her previous job caused her legs to turn black due to poor circulation, elevating her feet rectified the problem. (R. at 36, 39-40.) Haiar is able to get four hours of rest at a time, but she cannot sleep through the night. (R. at 41.)

Haiar's vision loss has affected her daily life. During the day, Haiar must listen to the television, because watching puts too much strain on her left eye. (R. at 36.) Also, she can no longer embroider or thread a needle, and she has difficulty typing. (R. at 32-33.) Although she can still drive up to ten-mile distances during the day, she is no longer able to drive at night. (R. at 34.) Haiar testified that her vision loss would prevent her from doing her former job. (R. at 40-41.) She reported that it takes all day to focus her left eye because it is getting weak. (R. at 36.) She also testified that at the time of the hearing she had not updated her glasses prescription in over one and one-half years. (R. at 44-45.)

Haiar's high blood pressure impacts her ability to maintain her home. (R. at 33.) She vacuums and cooks but is easily fatigued and is able to clean only one room per day. (R. at 33.) Her husband helps by washing the floors, carrying laundry, and accompanying her to the grocery store. (R. at 33-34, 39.) She is able to do some babysitting. (R. at 30.)

- 7 -

## 2. Medical Expert's Testimony

Medical expert Dr. James McKenna ("ME") testified before the ALJ on May 16, 2001 that Haiar suffered from a variety of impairments, including vision loss, hypertension, obesity, retinal thrombosis, and diabetes. (R. at 46-48.) The ME opined that none of Haiar's impairments, individually or together, meet or equal a listing. (R. at 48.) Because Haiar's most severe impairment, hypertension, caused organ damage, he precluded her from heavy work. (R. at 47.) The ME also precluded her from medium work due to retinal thrombosis, given her age and weight. (*Id.*) Due to Haiar's vision loss, the ME also precluded Haiar from driving industrial vehicles, and he limited her exposure to heights. (R. at 47-49.) Although he found that Haiar's obesity was an impairment, the ME did not confirm whether the obesity was severe because he had already precluded heavy work due to hypertension. (R. at 48.) The ME found that although Haiar was receiving treatment for diabetes, there was no evidence that the diabetes was significantly affecting her body system; thus, the ME reasoned that it was a non-severe impairment. (R. at 52.) He gave two reasons for this finding. First, he noted that retinal artery thrombosis is not an ordinary complication of diabetes. (*Id.*) Second, he opined that if the diabetes were the cause of Haiar's retinal artery thrombosis, her physician would treat it more aggressively in order to protect her left eye. (R. at 53.) Based on the record, the ME found no basis for limitations in sitting, standing, or walking. (R. at 49.) The ME found no evidence in the record for peripheral vascular disease and did not associate Haiar's TIAs with any impairment. (R. at 51, 55.)

### 3. Vocational Expert's Testimony

After reviewing evidence and observing the ALJ hearing, Vocational Expert Edward Steppon ("VE") described Haiar's past relevant work as a mail machine operator as light and unskilled work and her check processing writer position as sedentary, semiskilled work. (R. at 58.) The ALJ asked the VE whether a hypothetical female, at Haiar's age and same level of education and work experience, who was impaired by monocular vision, was obese, and had received treatment for hypertension and diabetes could perform Haiar's past relevant work. The ALJ limited this hypothetical individual to a traditional light exertional level of work that required standing or sitting for six out of eight hours. (*Id.*) The ALJ also said that the work should not require good depth perception or involve driving industrial vehicles, working around hazardous machinery, or working at unprotected heights. (R. at 58-59.) Given the hypothetical, the VE opined that Haiar could work at her previous position as a check writer, but not as a mail machine operator because of the job's need to use machinery. (R. at 59.)

Haiar's attorney posed further hypothetical situations to the VE. First, he inquired whether an individual with monocular vision where the functional eye watered or was blurry could work at a computer all day. (R. at 59.) The questions Haiar's attorney asked were ambiguous on points (e.g., asking the VE, "Can you work at a computer all day with the one eye?" (R. at 59.)), to which the VE initially responded that the more blurry a person's vision, the more impaired the person's job ability would be, but that the effects of incremental changes are beyond the VE's expertise. (R. at 61.) After some prodding, the VE stated that if an eye was so watery that it prevented the individual from focusing on her job, the condition could prevent functioning at that job. (R. at 60.) He also said if the blurring was severe enough it could

- 9 -

prevent a person from working. (R. at 61.) Next, Haiar's attorney asked whether a person limited to one hour of standing or sitting at a time, with two or three minute breaks in between, could work as a check writer. (R. at 64.) The VE opined that if the breaks were limited to only two or three minutes, a person could work as a check writer. (*Id.*) Breaks of fifteen minutes or longer, though, might preclude a person from such work. (*Id.*)

## E.    ALJ Findings

The ALJ made the following findings:

1.    The claimant met the disability insured status requirements of the Act on November 10, 1999, the date the claimant stated she became unable to work, and continues to meet them through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since November 10, 1999.

3.    The medical evidence establishes that the claimant has severe hypertension, diabetes mellitus, loss of vision of the right eye and obesity, but that she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's testimony was credible.

5.    The claimant has the residual functional capacity to perform work related activities except for work involving lifting more than 28 pounds at a time with frequent lifting and carrying of up to 10 pounds or performing any work performed at unprotected elevations or which would require good bilateral visual acuity (20 CFR 404.1545).[4]

---

[4] The Court assumes that "28" is a typographical error, and that the ALJ intended to find that Haiar could not lift more than "20" pounds at a time. "Twenty-eight pounds" is an anomalous figure, and "20 pounds" matches the ALJ's recitation of Haiar's testimony as to her lifting capacity.

- 10 -

6.  The claimant's past relevant work as a check writer did not require the performance of work related activities precluded by the above limitation(s) (20 CFR 404.1565).

7.  The claimant's impairments do not prevent the claimant from performing her past relevant work.

8.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e)).

(R. at 16.)

Haiar argues that this Court should reverse the ALJ's decision because the ALJ's analyses at steps three and four were incomplete. For the reasons stated below, this Court remands Haiar's case for additional findings consistent with this opinion.


## II.  **Discussion**

### A.  **Standard of Review**

The ALJ's decision will be upheld "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. § 405(g)). "Evidence is considered substantial if a reasonable person would accept it as adequate to support [the ALJ's] conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). In reviewing an ALJ's decision, the Court will not reweigh the evidence or substitute its own judgment for that of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nonetheless, the Court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the Court to uphold a denial of benefits, the ALJ must articulate his analysis of the evidence at some minimum level. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not supply a written explanation for

every piece of testimony or evidence, he must build an accurate and logical bridge from the evidence to his conclusion. *Id.* Further, "[i]n coming to his decision, . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002).

### B. Five-Step Inquiry for Benefits Determination

"In order to qualify for disability benefits, a claimant must be found 'disabled,' under the [Social Security Act]." *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (citing 42 U.S.C. § 423(a)(1)(E)). A claimant is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). An individual is considered unable to engage in substantial gainful activity when he or she is unable to perform previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). The ALJ employs the following five-step inquiry to determine whether a claimant is disabled:

> In the first step the ALJ considers the applicant's present work activity. Second, the ALJ weighs the severity of the applicant's impairment. The impairment or combination of impairments must significantly restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. If not, in the fifth and final step the ALJ uses the assessment

of RFC to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience.

*Arnold v. Barnhart*, 473 F.3d 816, 820-21 (7th Cir. 2007) (citations omitted).

At steps one through four the claimant bears the burden of proving her disability through medical and other evidence. 20 C.F.R. § 404.1512(a); *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner bears the burden of proof at step five. *Briscoe*, 425 F.3d at 352. At steps four and five, the ALJ considers the claimant's residual functional capacity ("RFC"), which is an assessment of what work-related activities the claimant can perform despite her limitations. 20 C.F.R. § 404.1545(a); *Dixon*, 270 F.3d at 1178.

In this case, the ALJ found that Haiar was not engaged in any substantial gainful activity and that her impairments were severe enough to proceed to step three of the analysis. At step three, the ALJ determined that Haiar's impairments were not severe enough, either singly or in combination, to meet or equal a listed impairment. (R. at 16.) At step four the ALJ determined Haiar could still perform her past relevant work, reasoning that she was not therefore entitled to DIB. (*Id.*)

## C. Analysis

Haiar challenges the ALJ's findings on three grounds. First, she argues that the ALJ failed to conduct a proper analysis at step three. (Pl. Mot. at 5-6.) Second, she claims that the ALJ's RFC and step four determinations are incorrect. (Pl.'s Mot. at 7-9.) Finally, she argues that the ALJ's hypothetical propounded to the VE was patently wrong. (*Id.*) Although the Court finds that the RFC and step four determinations are proper, as was the ALJ's hypothetical posed

- 13 -

to the VE, the Court finds that the ALJ failed to properly articulate the reasoning for his conclusions at step three. Therefore, the Court remands for further review.

### 1.    The ALJ's Step Three Analysis

Haiar argues that the ALJ's step three analysis is flawed because the ALJ failed to specify any listing and omitted explanation as to why Haiar's condition did not meet or medically equal a listed condition. (Pl. Mot. at 5-6.) In order to support his conclusion by substantial evidence, the ALJ need only minimally articulate his analysis; the ALJ is not required to provide a written explanation of every piece of evidence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). However, "where an ALJ omits reference to the applicable listing and provides nothing more than a superficial analysis," the Court must reverse and remand. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding an ALJ decision when the opinion omits specific listings and contains a perfunctory analysis because the opinion "frustrates any attempt at judicial review"); *Steele*, 290 F.3d at 940 (noting that omission of "a key listed impairment . . . coupled with [an] otherwise perfunctory analysis provided by the ALJ at step three" could require a remand); *Scott*, 297 F.3d at 595-96 (having "grave reservations" over whether the ALJ's opinion was adequate when it did not contain a listing or an assessment of listing criteria). Further, the Seventh Circuit has stated that a "two-sentence consideration of the Listing of Impairments is inadequate and warrants remand." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). Still, an ALJ's decision should be considered as a whole, and the ALJ may avoid repeating substantially similar factual analyses at multiple steps. *See Rice*, 384 F.3d at 370 n.5. In general, the Court gives the opinion a

"commonsensical reading rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Here, the ALJ's step three analysis and finding consists of two sentences: "The claimant alleges disability secondary to conditions of diabetes mellitus, hypertension, morbid obesity, depression, and loss of vision of the right eye. These impairments while severe, do not singly or in combination meet or equal any section of the Listing of Impairments." (R. at 13-14.) Essentially, the ALJ identifies Haiar's impairments and then states that they do not meet any listing. The ALJ neither references an applicable listing, nor ties his evidentiary review to his step three conclusions. Because the ALJ's brief analysis is superficial and without specific listings, it is inadequate.

The Court recognizes that although the ALJ mentions no factual evidence in his step three finding, the Court looks to the opinion as a whole in determining whether the ALJ provided sufficient reasoning to support his decision by substantial evidence. While assessing Haiar's RFC, the ALJ considered evidence from both examining and non-examining physicians, and based on Haiar's medical records the ALJ noted Haiar's symptoms of hypertension, morbid obesity, central retinal artery occlusion, glaucoma, diabetes, and knee problems. (R. at 14.) Although the ALJ uses these facts to support his RFC, the ALJ does not tie them into his decision regarding step three; these facts are only considered in the ALJ's opinion after he has concluded his step three analysis. Using a commonsensical approach, this itemization of conditions in the ALJ's step three analysis merely addresses what Haiar's ailments are, and it omits any reasoning as to how and why the ALJ concluded that the impairments did not meet or equal any section of the listing of impairments. A mere recitation of Haiar's medical records

- 15 -

does not build the required logical bridge between the facts and the findings, but instead leaves an impassible chasm between the facts and the ALJ's conclusion. *See Dixon*, 270 F.3d at 1176. Because the ALJ did not identify any applicable listing and gave only a perfunctory analysis, the Court must reverse and remand.

The Court addresses the Commissioner's arguments and finds them unavailing. The Commissioner argues that Haiar presented no substantial evidence to contradict the SSA's position on medical equivalency; thus, the ALJ did not have to articulate reasons for his findings. (Def. Resp. at 9.) *See Scheck*, 357 F.3d at 700-01 (finding that where no evidence supports the position the claimant meets or equals the listing, the ALJ need not articulate reasons for accepting agency determination); *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (ruling that the ALJ may "provide little additional explanation only so long as there is no contradictory evidence in the record"). These cases do not support the Commissioner. While the ALJ need only give little explanation to support his step three determination if no contradictory evidence exists, in this case at least some evidence supports Haiar's claim. Indeed, when the ALJ deemed Haiar's impairments "severe," without explaining why such "severe" impairments fall short of meeting or equaling any listing, he implicitly acknowledged that enough evidence exists to find the impairments "severe." Moreover, even if Haiar's ailments do not support a listing, the Court is unable to review effectively the ALJ's determination because the ALJ has not given even a hint

- 16 -

as to the applicable listing.[5] Because at least some evidence supported Haiar's claim, the ALJ was required to articulate reasons for his findings.[6]

The Commissioner also asserts that remand for reevaluation at step three would be futile because the evidence conclusively shows that Haiar does not meet or equal a listed impairment. (Def. Resp. at 11). This Court does not reweigh evidence or make factual findings; it reviews the ALJ's opinion for legal error. 42 U.S.C. § 405(g); *Steele*, 290 F.3d at 940; *Clifford*, 227 F.3d at 869. Here, the ALJ committed legal error by failing to articulate the basis of his step three findings, which warrants remand. The Commissioner points to Seventh Circuit case law that states, "No principle of administrative law or common sense requires [the Court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different [decision]." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). The Court does not remand this case in search of a perfect opinion. Instead, this Court remands because the ALJ's step three analysis is not supported by substantial evidence and is therefore legally deficient. *See Scott*, 297 F.3d at 595 (remanding where the ALJ prevented meaningful review by omitting discussions of facts and listings from his opinion). For these reasons, the Court reverses and remands the ALJ's decision.

---

[5] The Court notes that it is the Commissioner's burden to identify the pertinent listed impairment. *See Pouska v. Apfel*, No. 99 C 805, 2000 WL 1347891, at *4 (N.D. Ill. Sept. 19, 2000) ("The burden is on the ALJ in a Social Security disability proceeding to identify the relevant listed impairments in the federal regulations that compare with the claimant's impairment.").

[6] The Commissioner also argues that substantial evidence supports the ALJ's finding. (Def.'s Resp. at 8.) Even if enough evidence exists to support the ALJ's decision, the ALJ must rationally articulate the grounds for his decision in his opinion. *Steele*, 290 F.3d at 941. The Court confines its review to the grounds supplied in the ALJ's opinion. *See id.*

## 2. The ALJ's RFC Determination

Haiar also argues that the ALJ's RFC determination is invalid because the ALJ simply cited evidence and did not give any analysis. Specifically, Haiar states that the ALJ "failed to delineate a function-by-function paradigm that would have more accurately assessed [Haiar's] limitations." (Pl.'s Mot. at 7.) Haiar also claims that the ALJ disregarded her obesity in his RFC analysis. (Pl. Mot. at 7-9.)

By definition, an RFC is the most an individual can do in a work setting, despite any physical or mental limitations. 20 C.F.R. § 404.1545(a)(1); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *3; *Marlow v. Barnhart*, No. 04 C 7780, 2005 WL 2562652, at *18 n.30 (N.D. Ill. Oct. 13, 2005). An RFC assessment must consider an individual's remaining ability to perform each of seven exertional functions: sitting, standing, walking, lifting, carrying, pushing, and pulling. SSR 96-8p, 1996 WL 374184, at *5, *Qualkenbush v. Barnhart*, No. 01 C 8648, 2003 WL 22880838, at *7 (N.D. Ill. Dec. 5, 2003). Further, an ALJ should consider an individual's capacity to perform nonexertional activities such as stooping, climbing, seeing, communicating, and manipulating objects. SSR 96-8p, 1996 WL 374184, at *6. Without the function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. SSR 96-8p, 1996 WL 374184 at *3.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific [facts and evidence]. In assessing RFC, the adjudicator must discuss the individual's ability to perform

sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The [ALJ] must explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at \*7; *see also Briscoe*, 425 F.3d at 352. When assessing an RFC, an ALJ is bound to follow

SSR 96-8p. *Qualkenbush*, 2003 WL 22880838, at \*7 (citing *Prince v. Sullivan*, 933 F.2d 598,

602 (7th Cir. 1991)); *see also Lauer v. Bowen*, 818 F.2d 636, 640 (7th Cir. 1987) (finding that

"[Social Security Rulings] are intended not solely to be enlightening but are binding on the Social

Security Administration," including the ALJs, and may be used as precedent until expressly

"superceded, modified, or revoked by later legislation, regulations, court decisions or rulings").

An ALJ must also build an accurate and logical bridge from the evidence to his RFC

determination, confront evidence that does not support his conclusion, and explain why this

evidence was rejected. *Dixon*, 270 F.3d at 1176; *see also Kasarsky*. 335 F.3d at 544.

In this case, in determining Haiar's RFC, the ALJ outlined Haiar's hypertension and her

treatment procedures. He also discussed her retinal artery occlusion and her treatment of this

impairment. He noted her diabetes mellitus and her degenerative knee changes, while stating

that she "is able to ambulate unassisted with a normal gait and has not required surgical

intervention." (R. at 14.) The ALJ then considered medical testimony that specifically addressed

each of the seven functions listed in SSR 96-8. This testimony indicated Haiar's capacity for

lifting and carrying (weight and frequency), standing, walking, sitting, pushing, and pulling. This

testimony also gave insight into Haiar's ability to climb ladders, ropes, and ramps, as well as the

effects of Haiar's vision impairments on her capacity to do work. (R. at 14-15.) The ALJ then

considered Haiar's activities at home as they relate to her functional capacity. (R. at 15.) The ALJ noted testimony by Haiar that possibly contradicts that of the medical expert. (*Id.* ("[Haiar] could sit for a ½ hour stand for 30 minutes and walk two blocks before experiencing pain and discomfort. She did not believe that she could lift more than 15 to 20 pounds.")) Considering this evidence, the ALJ found that, although Haiar could not perform the demands of light work, Haiar could perform the demands of her prior receptionist position, which was classified as sedentary. (*Id.*) As can be seen from the ALJ's opinion, the ALJ considered evidence relating to each of the seven strength demands listed in SSR 96-8. The ALJ's review of the evidence was fairly thorough, and it included Haiar's testimony that conflicts with the medical expert's testimony. In light of this, the Court finds that the ALJ's RFC determination is supported by substantial evidence and complies with SSR 96-8p.

Furthermore, the Court finds that the ALJ properly considered Haiar's obesity when he made specific RFC findings. Social Security Ruling 02-01p requires an ALJ to consider the effects of a claimant's obesity when evaluating disability and residual functional capacity. *See* SSR 02-01p, 2000 WL 628049 at *6. The ALJ made multiple references to Haiar's obesity in his opinion. First, he wrote that "the claimant's treating physician . . . notes that the claimant is morbidly obese which significantly decreases her overall functional status and complicates her cardiac status." (R. at 14.) The ALJ also noted the DDS physicians' finding that Haiar's "obesity and other conditions prevent her from working in jobs which would require concentrated exposure to extreme heat or unprotected elevations." (R. at 15.) The ALJ then integrated the DDS physicians' opinion into his RFC determination by stating Haiar cannot "work at unprotected elevations or in temperature extremes." (*Id.*) The ALJ's opinion contains sufficient

- 20 -

discussion of Haiar's obesity to convince the Court that he properly considered it in the RFC context. Moreover, to the extent that the ALJ relied on the opinion of state agency physicians, these physicians did consider her obesity. *Cf. Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding that although the ALJ did not explicitly consider the claimant's obesity, he properly predicated his decision upon the opinions of the physicians who did discuss the claimant's weight). For these reasons, the ALJ did not contravene SSR 02-01p and his discussion of Haiar's obesity was sufficient.

### 3.    The ALJ's Hypothetical Question to the VE

Haiar argues that the ALJ's step four conclusion that Haiar could perform her past relevant work was wrongly predicated on the VE's faulty testimony. (Pl. Mot. at 8-9.) First, Haiar argues that the VE's opinion that Haiar could enter data on a computer despite her vision impairments is "a layman's guess as to a medical hunch." (Pl.'s Mot. at 8.) In support of this argument, Haiar cites *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995), and *Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996). These cases are inapposite. Together, these cases hold that the ALJ may not make his own medical determinations—the ALJ is not a medical expert—but must base his conclusions on evidence. However, the VE is competent to testify as to the vocational effects of various physical and mental impairments, which is precisely what occurred in this case. The ALJ propounded a hypothetical containing impairments, and the VE indicated how these impairments would affect the hypothetical person's vocational abilities. Haiar has not given any indication how the VE's conclusions regarding the vocational effects of Haiar's vision

impairments are a "layman's guess," particularly where the VE is by definition a vocational expert, not a layperson. The Court rejects this argument.

Haiar next argues that the ALJ's hypothetical was incomplete in that it did not contain all of Haiar's impairments. "Hypothetical questions posed to vocational experts ordinarily must include *all* limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942 (emphasis in original). "[W]here the hypothetical does not include all of the applicant's limitations, we must have some amount of evidence in the record indicating that the vocational expert knew the extent of the applicant's limitations." *Young*, 362 F.3d at 1003. *See also Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995) ("Because of the vocational expert's review of the record, coupled with his presence during Ragsdale's testimony, *Ehrhart* allows the reviewing courts to draw the conclusion that the vocational expert considered Ragsdale's various impairments even though all of those impairments were not specifically included in the ALJ's hypothetical question."); *Ehrhart v. Secretary of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992) ("Moreover, even if the hypothetical question omitted any medical evidence that accurately reflected Ehrhart's impairments, the vocational expert indicated that he had reviewed the documentary evidence prior to the hearing.").

Haiar states that the ALJ's hypothetical does not include all of Haiar's limitations. Specifically, the hypothetical does not include the following: "depression, intractible [sic] headaches and their effect upon the claimant, TIA's [mini strokes], cardiaomyopathy, venous stasis, lower extremities, arthralgias, shortness of breath, insomnia, and obesity." (Pl.'s Mot. at 8.) Haiar also states that the ALJ "does not list any restrictions relating to monocular vision or to pain, discomfort, tiredness resulting therefrom." (*Id.*) Initially, the Court has difficulty

understanding Haiar's argument. First, the ALJ's hypothetical explicitly indicates that the hypothetical claimant "is impaired by monocular vision." (R. at 58.) In addition, the ALJ's hypothetical also states that the claimant "has been noted to have obesity," (R. at 58), which Haiar acknowledges just before arguing that obesity is not included in the hypothetical.

The Court cannot find that the hypothetical is deficient. The record clearly indicates that the VE was present during Haiar's testimony. Furthermore, the record shows that the VE reviewed Haiar's medical records. (R. at 58.) Following *Ragsdale* and *Ehrhart*, the Court concludes that the ALJ was able to learn independently of Haiar's impairments and apply them to the hypothetical. For this reason, the Court does not find that the ALJ's omission of several of Haiar's impairments makes the hypothetical invalid.[7]

Haiar also raises several peripheral arguments regarding the ALJ's hypothetical that the Court finds are not convincing. First Haiar claims that the ALJ "does not specifically include any restrictions based upon those [listed] impairments or analysis as to how those conditions may affect the claimant." (Pl.'s Mot. at 8.) However, in the hypothetical the ALJ limited the claimant "to a traditional light exertional level, meaning lifting up to 20 pounds occasionally, 10 pounds frequently, the ability to be on her feet six out of eight hours, or sit six out of eight." (R. at 58.) Second, Haiar suggests that the ALJ should have directed the VE to consider "any restrictions relating to monocular vision or to pain, discomfort, [or] tiredness resulting therefrom." (Pl.'s

_____

[7] The Court notes the counterintuitive nature of presuming that the VE has considered all of the claimant's impairments, regardless of whether those impairments are listed in the ALJ's hypothetical. Hypothetical questions are just that—they are hypothetical, meaning that the VE is not asked about the particular claimant. Logically, this would seem to indicate that the VE should not import independently-learned impairments into the ALJ's hypothetical. This point notwithstanding, the Court is bound to follow established Seventh Circuit case law, including *Ehrhart* and its progeny.

Mot. at 8.) The Court does not believe this is required. The VE was aware of the hypothetical claimant's monocular vision because the hypothetical included this limitation. The VE, as an expert on the vocational effects of various impairments, would have a better ability than the ALJ to determine "any restrictions relating to monocular vision." The Court believes that requiring the ALJ to include the particular limitations of a particular impairment would be akin to asking the ALJ to violate the requirements of *Wilder* and *Rohan*.

For these reasons, the ALJ's hypothetical was proper.

### III. Conclusion

Based on the foregoing, the Court grants in part and denies in part Haiar's Motion to Reverse the Commissioner's Decision. This Court denies the Commissioner's Motion for Summary Judgment and remands to the Commissioner for further proceedings consistent with this opinion.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: July 31, 2007.                    United States Magistrate Judge

- 24 -

Copies have been mailed to:

ASHLEY S. ROSE, Esq.
Law Offices of Ashley S. Rose
799 Roosevelt Road
Building 6, Suite 104
Glen Ellyn, IL 60137

DONALD R. LORENZEN, Esq.
Assistant United States Attorney
219 South Dearborn Street
Chicago, IL 60604

ALFRED C. SANCHEZ, Esq.
Assistant Regional Counsel
Social Security Administration
200 West Adams Street
30th Floor
Chicago, IL 60606

Attorney for Plaintiff

Attorneys for Defendant